UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 08-22235-CIV-GOLD/MCALILEY

DAVID RANCK,

      Plaintiff,

v.

KATHERINE FERNANDEZ
RUNDLE, DON L. HORN, and
JOSE ARROJO, individually,

      Defendants.

_____/

<u>ORDER GRANTING MOTION FOR SUMMARY JUDGMENT; CLOSING CASE</u>

This CAUSE is before the Court on Defendants' Motion for Summary Judgment, converted from their Motion to Dismiss [DE 7].  At oral argument set initially on the Motion to Dismiss, I determined that it was appropriate, pursuant to Fed. R. Civ. P. 12(d), to convert the Motion to one for Summary Judgment due to issues raised by the parties and required supplemental briefing and materials to be filed [DE 22].  Oral argument on the Motion for Summary Judgment was held on June 12, 2009.  I have now carefully reviewed the pleadings and the relevant law.  For the following reasons, Defendant's Motion for Summary Judgment is granted.

**I.      Factual Background**

In the Southern District of Florida, a party moving for summary judgment must submit a statement of undisputed facts.  S.D. Fla. L.R. 7.5.  If necessary, the non-moving party may file a concise statement of the material facts as to which it is contended there exists a genuine issue to be tried.  *Id.*  Each disputed and undisputed fact must be

1

supported by specific evidence in the record, such as depositions, answers to interrogatories, admissions, and affidavits on file with the Court.  *Id.*  All facts set forth in the movant's statement which are supported by evidence in the record are deemed admitted unless controverted by the non-moving party.  *Id.*  Defendant has not provided such a statement.  However, on my review, the parties did not controvert certain facts asserted by the other party, and I have determined the relevant facts set forth below to be undisputed.

Plaintiff David Ranck brings a single-count action under 42 U.S.C. § 1983 against his Defendants Katherine Fernandez Rundle, Don L. Horn, and Jose Arrojo in their individual capacities for adverse employment action they took to retaliate against the exercise of his First Amendment rights to free expression.  Plaintiff was employed as an Assistant State Attorney ("ASA") at the Miami-Dade Office of the State Attorney ("SAO"). [DE 1, ¶ 5].  At the relevant time, he was the Division Chief in the felony unit within the SAO and was responsible for prosecuting homicide cases. [*Id.*; DE 1, ¶ 12]  Defendant Rundle is and was the State Attorney for the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, and had responsibility for the discipline of personnel within the SAO. [DE 1, ¶ 6].  Defendants Horn and Arrojo were respectively the Chief ASA for Administration and for Special Projects, and they were delegated authority by Rundle to discipline personnel within the SAO. [DE 1, ¶¶ 7, 8].  It was within Defendants' supervisory authority and responsibility to discipline Plaintiff.  [*Id.*; DE 29-3, ¶ 2].

Senior homicide prosecutors at the SAO were placed on police shooting duty.  [DE 1, ¶ 14].  On January 16, 2004, Plaintiff was on policy shooting duty and was called to

respond to a police shooting involving Miami-Dade police officer Jorge Espinosa.  [DE 1, ¶ 19].  At the scene of the shooting, Plaintiff met with and was briefed by Miami Dade police detective Charles McCully, who was the lead detective assigned to the investigation.  [DE 1, ¶ 20].  The police shooting had led to the death of Leonardo Barquin.  [DE 1, ¶ 21].  This shooting was the subject of an investigation by the SAO, to which Plaintiff was assigned.

On January 20, 2004, Plaintiff received a telephone call from McCully.  [DE 1, ¶ 30].  On this call, Plaintiff told McCully that because there was no proof that Barquin possessed a firearm and that one of the shots hit Barquin at the top of the buttocks, he could not say that the shooting was "justified" or "clean."  [DE 1, ¶ 31].  Subsequent to that call, a decision was made by Plaintiff's superiors that he should be removed from the investigation.  On February 23, 2004, Plaintiff emailed Rundle, Horn, and others a memorandum documenting his account of his removal from the Barquin shooting investigation (the "Memo").  [DE 1, ¶ 38].  The Memo stated in part that,

> I wish to expressly invoke any protections which I might have under Florida or federal "Whistle blower" laws.
>
> These actions [to remove me] are not consistent with the avoidance of the appearance of impropriety.  To just summarily remove an A.S.A. from an investigation of a police shooting that he was assigned because of a call made by a POLICE MAJOR, when that ASA had expressed legitimate, justified reservations about the propriety of the shooting could hardly look worse to a community that has the right to expect independence of this office from the police agency involved.
>
> The decision to remove me will only embolden Butler and perhaps other police officers and departments to "take the ball and go home" whenever there is a disagreement with an ASA, to bypass the ASA completely and go over his/her head and get the ASA removed.  And when, not if, that happens I fear that an ASA, like me, who the police have complained about once, will be viewed as a "repeat offender," as one who "can't get

> along with the police," rather than as one who did nothing wrong in the
> first place.

[DE 29-2, pp. 22-23].  Plaintiff received no response to his Memo and was not otherwise disciplined for any of his conduct as related to the Barquin investigation.  [DE 1, ¶ 38].

Over three years later, on July 13, 2007, Plaintiff made a public records request by an email to Horn for Plaintiff's email of February 23, 2004 containing the Memo. [DE 29-2, p. 19].  Horn confirmed with Plaintiff that he was making a public records request for an email that Plaintiff himself had authored, to which Plaintiff responded, "Don, I thought if I was to 'legally' have it as a public record that I had to make the request even though I sent it."  *Id.*  Later that day, Horn emailed Plaintiff, attaching the February 2004 email containing the Memo.  No conditions were imposed on its release.  There are no facts in the record to suggest this public record request was deficient in any way.  Plaintiff also made a public record request on May 5, 2008 of other emails from early 2004 concerning the Barquin investigation.

On May 5, 2008, Plaintiff made public the Memo by posting it on a blog he created and sending a link to his posting to the Justice Building blog, a well known public forum used by lawyers practicing criminal law in Dade County.  [DE 1, ¶ 44].  The Memo was posted under the heading "Police Shooting of Leonardo Barquin."  At the time, the Barquin investigation was still open, even though Plaintiff may have been under the impression that it was closed.  In addition, in May and June 2008, Plaintiff posted to his blog other internal emails from 2004, also procured by way of a public record request, relating to his removal from the Barquin investigation, along with his personal commentary on the veracity of statements made by his superiors.  [DE 29-3, pp.27-44].

4

On July 14, 2008, Plaintiff was suspended without pay for 30 days.  [DE 29-2, p.6].
The reasons for the suspension were set forth in a Notice of Disciplinary Action, which
included his public posting of information about an ongoing police shooting investigation,
the posting of derisive and offensive comments senior ASAs, and inflicting harm to the
integrity, reputation, and well-being of the SAO.  *Id.*  The Notice contained additional
reasons for the suspension, citing Plaintiff's lack of candor with respect to securing
approval for payment of expert witness fees in May 2008 and his in-court misconduct
before the Circuit Court in September 2005. [*Id.*; DE 29-2, p.24].[1]

## II.    Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment
when the pleadings and supporting materials show that there is no genuine issue as to any
material fact and that the moving party is entitled to judgment as a matter of law.  *See
Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it hinges
on the substantive law at issue and it might affect the outcome of the nonmoving party's

---

[1] In support of their Motion for Summary Judgment, Defendants have filed the SAO's
Employee Handbook, various internal emails, and the affidavits of Horn, Arrojo, and
Howard Pohl, another Chief ASA, each of which attach additional materials.  Plaintiff has
filed an affidavit and a supplemental affidavit, among other materials.  Defendants have
moved to strike Plaintiff's first affidavit [DE 33], contending it was filed untimely (by one
day) and that it contains "bare, unsupported, conclusory, self-serving statements."
Notwithstanding the fact that I rely only on Plaintiff's supplemental affidavit in resolving this
Motion, which Defendants have not moved to strike, I conclude that the untimely filing of
the initial affidavit caused Defendants no prejudice, and that it can appropriately be relied
on as rebuttal evidence.   My review of the affidavit, while undoubtedly containing
assertions of fact favorable to himself, comports with the requirements of Fed. R. Civ. P.
56(e)(1), which requires a supporting or opposing affidavit be made on personal
knowledge, to set out facts that would be admissible in evidence, and to show that the
affiant is competent to testify on the matters stated."   Accordingly, the Motion to Strike is
denied.

claim.  *See id.*  ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").  The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 252; *Bishop v. Birmingham Police Dep't*, 361 F.3d 607, 609 (11th Cir. 2004).

The moving party bears the initial burden under Rule 56(c) of demonstrating the absence of a genuine issue of material fact.  *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir. 1997).  Once the moving party satisfies this burden, the burden shifts to the party opposing the motion to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial."  *Celotex v. Catrett,* 477 U.S. 317, 324 (1986).  A factual dispute is genuine only if the evidence is such that a reasonable fact finder could return a verdict for the non-moving party.  *Anderson,* 477 U.S. at  248; *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001).

In assessing whether the movant has met its burden, the court should view the evidence in the light most favorable to the party opposing the motion and should resolve all reasonable doubts about the facts in favor of the non-moving party.  *Denney,* 247 F.3d at 1181.  In determining whether to grant summary judgment, the court must remember that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Anderson*, 477 U.S. at 255.

## III.    Discussion

Plaintiff alleges that his suspension was in retaliation for the exercise of his First Amendment rights of expression.  In response, Defendants argue that Plaintiff cannot prevail because they are entitled to qualified immunity.  Qualified immunity offers complete protection for government officials sued in their individual capacities.  *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002). A government official claiming qualified immunity must first establish that he was acting within his discretionary authority. *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003).  If so, the plaintiff bears the burden of showing that qualified immunity is inappropriate.  Plaintiff must demonstrate (1) plaintiff's allegations, if true, show the official's conduct violated a constitutional right"and (2) the right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001); *Vinyard*, 311 F.3d at 1346.[2]  Plaintiff does not dispute that Defendants were acting in their discretionary authority when they suspended Plaintiff without pay.  I therefore proceed to determine if Plaintiff has carried his burden of demonstrating the violation of a clearly established constitutional right.

A.      Violation of a Constitutional Right

"[T]he law is well-established that the state may not demote or discharge a public employee in retaliation for speech protected under the [F]irst [A]mendment." *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989), but "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her

---

[2] The Supreme Court receded from *Saucier* in *Pearson v. Callahan*, 129 S. Ct. 808, 818, 172 L. Ed 2d 565 (2009) to the extent that it gave district courts the discretion to consider the second prong first under appropriate circumstances to conserve judicial resources.  However, because I conclude that Plaintiff would have established a deprivation of his constitutional rights absent other legitimate reasons for his suspension, it is fruitful for me to examine the contours of the alleged constitutional right at issue.

freedom." *Garcetti v. Cebellos*, 547 U.S. 410, 418, 126 S. Ct. 1951, 1958 (2006). To state a claim that a government employer took disciplinary action in retaliation for constitutionally protected speech, a public employee must show that: (1) the speech involved a matter of public concern; (2) the employee's free speech interests outweighed the employer's interest in effective and efficient fulfillment of its responsibilities; and (3) the speech played a substantial part in the adverse employment action. If an employee satisfies her burden on the first three steps, the burden then shifts to the employer to show by a preponderance of the evidence that (4) it would have made the same decision even in the absence of the protected speech. *Boyce v. Andrew*, 510 F.3d 1333, 1343 n.12 (11th Cir. 2007)*; Bryson v. City of Waycross*, 888 F.3d 1562, 1565-66 (11th Cir. 1989). The first two elements are questions of law; the latter two and questions of fact. *Cook v. Gwinnett County Sch. Dist.*, 414 F.3d 1313, 1318 (11th Cir. 2005). I proceed to address each element in turn.

1.    Speaking as a citizen on a matter of public concern

Following *Garcetti*, the Eleventh Circuit modified the analysis of the first step by establishing as a threshold inquiry whether the government employee spoke as an employee or citizen and if the speech addressed an issue relation to the mission of the government employer or a matter of public concern. *Battle v. Bd. of Regents for Ga.*, 468 F.3d 755, 760 (11th Cir. 2006) (quoting *Garcetti*, 547 U.S. at 418, 126 S.Ct. at 1958); *see also D'Angelo v. Sch. Bd. of Polk County, Fla.*, 497 F.3d 1203, 1209-10 (11th Cir. 2007); *Vila v. Padron*, 484 F.3d 1334, 1339 (11th Cir. 2007). Most recently, the Eleventh Circuit expressed a stringent view of when a public employee speaks as a citizen in *Abdur-Rahman v. Walker*,   --- F.3d ---, 2009 WL 1270864 (11th Cir. May, 11, 2009),

notwithstanding the well-reasoned dissent by Judge Barkett, and I proceed with considerable care in determining whether Plaintiff has satisfied this threshold inquiry.

a.      Speaking as a citizen or employee

When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.  *Garcetti*, 547 U.S. at 421, 126 S. Ct. at 1960.  Only when "[e]mployees who make public statements outside the course of performing their official duties [do] they retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government."  *Id.* at 1961.  The "proper inquiry is a practical one."  *Id.*  The "controlling factor" is that the speech was made pursuant to plaintiff's work duties, *id.* at 1960, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes, *id.* at 1962.   "A court must therefore *discern the purpose of the employee's speech* – that is, whether she spoke on behalf of the public as a citizen, or whether the employee spoke for herself as an employee."  *Boyce v. Andrew*, 510 F.3d at 1343 (quoting *Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir. 1993)) (emphasis added).   However, while the mere fact that the speech concerns the subject matter a plaintiff's employment is "nondispositive" of the conclusion that plaintiff was speaking as an employee, the Court also noted that restricting speech that "owes its existence" to the employee's professional responsibilities  does not infringe any constitutional liberties.  *Garcetti*, 547 U.S. at 421, 126 S. Ct. at 1958, 1959; *Abdur-*

9

*Rahman*, 2009 WL 1270864, at \*6  (holding that the Eleventh Circuit has "consistently discredited narrow, rigid descriptions of official duties to support an inference that public employees spoke as private citizens").

As an initial matter, I consider whether the underlying Memo, as written in 2004, constituted speech by a citizen or an employee.  Plaintiff's primary argument that the Memo was written in his capacity as a citizen and not an employee is that he had no obligation to write the memo and that it was written on his own volition.  This argument fails.  The absence of an affirmative duty for a plaintiff to make a certain type of speech does not preclude the fact that the person may still be speaking as a public employee pursuant to his official duties.  *Abdur-Rahman v. Walker*,  --- F.3d ---, 2009 WL 1270864, \*6 (11th Cir. May, 11, 2009) (holding that the test is not whether an employee's job mandated the act of speaking); *D'Angelo*, 497 F.3d at 1210 (holding that a high school principal did not speak as a citizen when he worked, on his own initiative, to convert his high school to charter status and was terminated because it was still nevertheless part of his official responsibilities).

Under the prevailing law of this Circuit, Plaintiff wrote this Memo pursuant to his official duties.  It is undisputed that Plaintiff is the ASA originally assigned to the Barquin shooting and that his position required him to make findings and recommendations concerning investigations on which he is assigned.   The Memo recounted details concerning the investigation of the Barquin shooting, his impressions of the shooting, the subsequent efforts by the police department to follow up on the investigation, and his removal from the investigation.  Such speech falls within Plaintiff's official responsibilities as an ASA who was assigned to the Barquin investigation.  In *Khan v. Rundle*, 287 Fed.

10

App. 50, 53 (11th Cir. 2007), the Court concluded that an ASA who made truthful comments in open court, in contravention of his superiors' orders that he misrepresent certain facts, deserved no First Amendment protection because he made his comments as a public employee representing the state of Florida.  Similarly, here, Plaintiff  spoke pursuant to his status as an employee while representing the state of Florida in a police shooting investigation in voicing concerns about the investigation.  *See also Abdur-Rahman*, 2009 WL 1270864, at *6 (concluding that public works inspectors' reports that included information they did not have duty to report nevertheless owed their existence to the inspectors' principal job responsibilities); *Phillips v. City Dawsonville*, 499 F.3d 1239 (11th Cir. 2007) (City Clerk's speech regarding improper use of city resources and of behavior that may result in expense and liability for the City fell within her official duties even though not specifically enumerated); *Vila*, 484 F.3d at 1339-40 (employee who criticized what she believed was illegal or unethical behavior of officials at Miami-Dade Community College, including noncompliance with bidding and request-for-proposal procedures, irregularities with the use of outside counsel was speaking as an employee). Accordingly, Plaintiff spoke as a public employee when he composed the Memo in 2004.

Nevertheless, Plaintiff argues that he was speaking as a citizen when the Memo was made accessible to the general public through publication on his blog four years later, in May 2008.[3]  Defendant argues in rebuttal that the blog entry is simply the memo as written

---

[3] It is undisputed that Plaintiff's suspension had no connection to Plaintiff writing the memo in February 2004.  The adverse employment action here, suspension without pay, was alleged to be the result of Plaintiff's reproduction of that memo on a public blog. Therefore, for the purpose of determining whether Plaintiff's speech was made in his capacity as a citizen or an employee. I have to look to the purpose and context behind the blog posting of the Memo and not merely the Memo as it was originally written.

in 2004 and therefore the blog entry "owes its existence to" his duties as an Assistant State Attorney.  Admittedly, Plaintiff's blog entry in 2008 owes its existence to the Plaintiff's Memo written in February 2004, which as discussed above, was written pursuant to his professional responsibilities.  But *Garcetti* also held explicitly that a public employee can speak as a citizen even when discussing the subject matter of his or her employment. *Garcetti*, 547 U.S. at 421.  Defendant's suggestion that simply because the content of the blog entry is essentially a reproduction of the Memo renders it automatically speech by an employee is unpersuasive, for they ignore the need to examine the differences in purpose and motivation associated with the speech.  *Boyce*, 510 F.3d at 1343 ("A court must therefore discern the purpose of the employee's speech-that is, whether she spoke on behalf of the public as a citizen, or whether the employee spoke for herself as an employee"); *see Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008) (opining that "[i]f...a public employee takes his job concerns to persons outside the work place in addition to raising them up the chain of command at his workplace, then those external communications are ordinarily not made as an employee, but as a citizen").[4]

---

[4] Defendants cite two cases in rebuttal.  For example, in *Omokehinde v. Detroit Bd. of Educ.*, 563 F. Supp. 2d 717, 726-27 (E.D. Mich. 2008), the Court held that simply disseminating an initial internal compliant to an outside party, where the substance is the same, cannot turn speech that was made by an employee to one by a citizen.  *See also Andrew v. Clark*, 472 F. Supp. 2d 659 (D. Md. 2007) (overturned on other grounds) (same). These cases are well-reasoned, but they do not involve the unique circumstances here involving the procurement of the "speech" at issue via a public record request years after the speech was originally communicated, which changes the character of the speech. Further, while my research has not revealed binding precedent that is on point, I do not believe the Eleventh Circuit would adopt, as Defendants would desire, essentially a *per se* rule whereby speech that was originally by an employee will always, regardless of the change in purpose or motivation of the speaker, remain speech by an employee.  I clarify, at the same time, that I do not intend to hold that any time public employee speech is made externally, it automatically becomes speech by a citizen.  The factual circumstances, as

In contrast to the authorship of the Memo in February 2004, the publication of the Memo was done after a public record request for the Memo was made to and complied with by Horn.  Fla. Stat. § 119.01(1) ("It is the policy of this state that all state, county, and municipal records are open for personal inspection and copying by any person.").  In obtaining the Memo via a public records request, Plaintiff stated he wanted to be in "legal" possession of it.  Although Florida public record law provides exemptions to public disclosure of certain types of documents, *see generally* Fla. Stat. § 119.071, Horn did not invoke any such exemptions in providing the Memo, or otherwise condition the production of the Memo with limitations its dissemination or the excision of confidential information.  Further, Plaintiff attests that he "decided to publish the [Memo] to the Justice Building blog in order to alert the legal community about the possible wrongdoing involving a police agency and the appearance of impropriety of the [SAO] in the manner in which I was removed [police shooting investigations] because of the police agency's disagreement with my opinion about the legitimacy of the Barquin shooting." [DE 44-2, ¶ 11].  The record therefore establishes, with all inferences drawn in favor of Plaintiff, that Plaintiff sought to be in possession of the Memo as a public record.

Defendants argue that Horn was merely giving Plaintiff a memorandum Plaintiff himself had written in his capacity as an SAO employee and that he should have known the memorandum remained confidential.[5]  However, as discussed, the public record

applied against the legal standard, should govern each case.

[5] Defendants further maintain that the Memo remained exempt from disclosure to the public under Florida public record law.  Under Fla. Stat. § 119.071(1)(d)(1), relied on by Defendants, "the exemption only extends to those records that contain the attorney's mental impressions, litigation strategy, or legal theory *and* are prepared exclusively for

request was complied with without conditions, and Plaintiff was entitled to treat it as a public record. To credit Plaintiff's argument – that it is essentially irrelevant that Plaintiff obtained the Memo as a public record – would be to eviscerate the significance and importance of Florida's public record law, a primary mechanism afforded to the public to hold their government accountable. Indeed, at oral argument, Defendants concede that an employee seeking a memorandum he himself wrote via a public record request to his superior "is probably not something that happens every day." Tr. Jun. 12, 2009, 4:24 pm. It is without doubt Defendants have control over how to respond appropriately to the public record request and take into account what should have been a clear "red flag" that Plaintiff was seeking what purportedly is a confidential document as a public record.[6] I conclude,

_____

litigation or in anticipation of imminent litigation." *Lightbourne v. McCollum*, 969 So. 2d 326, 332 (Fla. 2007) (emphasis in original). The Memo discussed why Plaintiff felt he was being unfairly criticized for his conduct on the Barquin investigation and cannot be said to have been prepared either exclusively or in anticipation of imminent adversarial proceedings against Espinosa, the police officer who shot Barquin. And as discussed, even if the Memo fell under this provision, Defendants cannot claim to have exercised their power to impose an exemption on its disclosure after providing the Memo to Plaintiff as a public record. Their reliance on Fla. Stat. § 119.071(1)(d)(2), which provides that records falling under § 119.071(1)(d)(1) need not be disclosed to the public simply because the record was released to another public employee or officer of the same agency, is therefore misplaced. Further, in order to preserve the exemption, Defendants were required to "identify the potential parties to any such criminal or civil litigation or adversarial administrative proceedings," which they did not do. Fla. Stat. § 119.071(1)(d)(2).

[6] The level of control Defendants had over the ultimate public dissemination of the Memo is in contrast to the Eleventh Circuit's fundamental concern in *Abdur-Rahmani, supra*. In that case, the Court rejected a framework whereby public employees would be permitted to request nonpublic information under the auspices of their job duties and then gain the constitutional protection for whatever statements they desired to make about that information, so long as the employee is able to describe their assigned responsibilities narrowly enough to exclude the speech. This is not the case here, and I reject any contention by Plaintiff that he spoke as a citizen simply because it was not part of his job duties to communicate an internal memorandum to the public.

under these unique circumstances, that Plaintiff was not speaking pursuant to his official duties, but as a citizen whose speech was to raise concerns about the handling of the Barquin investigation by the SAO after the ASA initially assigned to the investigation was removed due to his opinions about the legitimacy of the shooting.  Accordingly, under the applicable legal standards, and in viewing the evidence in the light most favorable to Plaintiff, I conclude Plaintiff spoke as a citizen.

    b. Matter of public concern

   Deciding whether a government employee's speech relates to his or her job, as opposed to an issue of public concern "must be determined by the content, form, and context of a given statement, as revealed by the whole record."  *Connick v. Myers*, 461 U.S. 138, 147-48, 103 S. Ct. 1684, 1690, 75 L. Ed. 2d 708 (1983).  I look to the "main thrust" of the speech in question to determine if it is "essentially public in nature or private, whether the speech was communicated to the public at large or privately to an individual, and what the speaker's motivation in speaking was."  *Mitchell v. Hillsborough County*, 468 F.3d 1276, 1283 (11th Cir. 2006); *see Goffer v. Marbury*, 956 F.2d 1045, 1050 (11th Cir. 1992) ("A highly emphasized factor [in the public concern inquiry] is whether the speaker is in pursuit of purely private interests"); *Deremo v. Watkins*, 939 F.2d 908, 910-11 (11th Cir.1991) ("Also relevant is the employee's motivation in speaking").  "[T]he relevant inquiry is not whether the public would be interested in the topic of the speech at issue but rather is whether the purpose of the speech was to raise issues of public concern."  *Maggio v. Sipple*, 211 F.3d 1346, 1353 (11th Cir. 2000).  Mere reference to a matter of public import does not suffice.  *Id.* at 1351-1352.  Moreover, a "public employee may not transform a

15

personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run". *Boyce*, 510 F.3d at 1344.

In considering the content, form, and context of the speech, it is apparent that Plaintiff's speech touches on a matter of public concern.  I look first to the content of the speech to determine if it was essentially public in nature or private.  Contrary to Defendant's argument that the speech is merely an employee grievance, Plaintiff's Memo explicitly states that he had no objection to being taken off police shooting investigations, stating "[b]ecause I do not need extra work I do not object to that decision."  Indeed, it is the *manner* in which he was removed that Plaintiff wished to address.  The "main thrust" of the Memo was therefore to discuss the manner in which he was removed, culminating in Plaintiff's conclusion that the manner in which he was removed was "not consistent with avoidance of the appearance of impropriety," that the SAO's actions "could hardly look worse to a community that has the right to expect independence of this office from the police agency involved," and that the police department would be "embolden[ed], whenever there is a disagreement with an ASA, to bypass the ASA completely...and get the ASA removed." *Morris v. Crow*, 142 F.3d 1379, 1381 (11th Cir. 1998) (the key consideration as whether information is of public concern is the purpose of the communication).  It is without doubt a matter of public concern that the conduct of public safety officials is held to appropriate legal standards.  *Fikes v. City of Daphne*, 79 F.3d 1079, 1084 (11th Cir. 1996) (question of whether police officers are properly performing their duties, as a public safety issue, must be considered an issue of political or social concern); *Cooper v. Smith*, 89 F.3d 761, 765 (11th Cir. 1996) ("There can be no doubt that corruption in a police department

is an issue of public concern"); *cf. Moore v. Kilgore*, 877 F.2d 364, 370 (5th Cir.1989) (a firefighter's speech to the news media as president of a firefighter's union, criticizing the department's insufficient manpower related to a matter of public concern because "[t]he public, naturally, cares deeply about the ability of its Fire Department to respond quickly and effectively to a fire."). Although Defendants point out correctly that Plaintiff was also denying, through his Memo, that he did anything inappropriate by voicing his opinions to McCully, it cannot be said that Plaintiff was in pursuit of purely private interests.[7]  Indeed, the Memo indicates his disagreement with Defendants' criticism of his conduct was no longer a major concern to Plaintiff.[8]  The Supreme Court has noted that speech in the whistleblowing context weighs in favor of characterizing such speech as involving a matter of public concern.  *Garcetti*, 126 S.Ct. at 1962 ("Exposing governmental inefficiency and misconduct is a matter of considerable significance...The dictates of sound judgment are reinforced by the powerful network of legislative enactments-such as whistle-blower protection laws and labor codes-available to those who seek to expose wrongdoing."); *see also Myers v. Hasara*, 226 F.3d 821 (7th Cir. 2000) (In the context of First Amendment

---

[7] I note that the blog entry as posted was not simply a reproduction of the Memo, but was posted under the heading "Police Shooting of Leonardo Barquin."

[8] The Memo states in the last paragraph, "[Don and I] further discussed the case and afterwards he said that he now had a better understanding of the conversation.  His actions were generous and gracious, I accepted his sentiments and we shook hands.  It is my wish to put this matter to rest.  I harbor no ill will toward anyone because of this incident.   But I absolutely and vigorously deny that anything I did or said in this investigation was wrong or inappropriate in any way."   Defendants focus on the last sentence, but in the context of the entirety of the paragraph, and the focus of the rest of the Memo, I do not conclude this Memo was merely a personal grievance.  Therefore, this is not a case where a plaintiff has merely "transformed a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run."

claims by public employees, whistleblowing does not need to be limited to systemic charges of corruption to qualify as a matter of public concern; a specific violation of a law that creates a risk to public health, safety, *or good governance* likewise is a matter of public concern) (emphasis added).

Finally, the applicable standard on whether the speech was on a matter of public concern further requires me to examine whether the speech was communicated to the public at large or privately to an individual, and what the speaker's motivation in speaking was.  It is undisputed that the speech was communicated to the public at large, and as discussed above, the purpose and motivation behind Plaintiff's speech to raise concerns about the handling of the Barquin investigation by the SAO after the ASA initially assigned to the investigation was removed due to his opinions about the legitimacy of the shooting. Accordingly, the content, form, and context of Plaintiff's speech, as informed by the whole record, demonstrate that Plaintiff's speech made a sufficient showing that

2.      Balancing of the employee's and employer's respective interests

The need to balance the competing interests of the employer and employee was articulated in the seminal case of *Pickering v. Bd. of Education*, 391 U.S. 563, 88 S. Ct. 1731 (1968).  In striking balance between public employee's First Amendment interests and interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees, the court considers: (1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made.  *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1289 (11th Cir. 2000); *Bryson*, 888 F.2d at 1567

(relying on *Morales v. Stierheim*, 848 F.2d 1145, 1149 (11th Cir. 1988)).  In considering whether Plaintiff's speech impeded the SAO's ability to perform its duties efficiently, I am to examine "whether the statement impairs discipline by superiors or harmony among co-workers, [or] has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary." *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S. Ct. 2891, 2898, 97 L. Ed. 2d 315 (1987); *McCabe v. Sharrett*, 12 F.3d 1558, 1570 (11th Cir. 1994).  There is no bright-line standard, and a careful balancing of competing interests on a case-by-case basis is required.  *Stanley*, 219 F.3d at 1289.  However, greater deference is given to restrictions on employees' speech, in order to balance government employer's legitimate interests in its mission.  *Boyce*, 510 F.3d at 1343.

Defendants argue that interest of the SAO in maintaining the confidentiality of ongoing police investigations, appropriate employee conduct, and a working relationship with law enforcement agencies are legitimate interests that outweigh Plaintiff's alleged rights to publish the Memo.  Specifically, Defendants contend, and Arrojo has attested through his declaration, that the publication of the Memo caused has "affected the working relationship between the command staff of the Miami-Dade Police Department's Homicide Bureau...." [DE 29-3, ¶ 9].  Further, the insinuations in the Memo that unethical and possibly illegal motivations on the part of the police department and inflammatory language to the effect that the "victim should be in jail right now, not dead" impairs the working relationship between the SAO and the police department.  Also uncontroverted is Defendants' assertion that Plaintiff's Memo undermined the SAO's consistent position with respect to the Barquin investigation, which is that the SAO "cannot discuss the Barquin

case [or the] investigation as the matter is still open and pending." [DE 29-2, p.7].  Finally, Defendants claim that the publication of the Memo breached the confidentiality of the Barquin investigation, which impeded the ability of the SAO to perform its duties.[9]

While I give deference to these reasons, I conclude they are nevertheless flawed and do not outweigh the considerable interests of Plaintiff to engage in speech involving a document he specifically acquired via a public record request.[10]  First, the applicable legal standards require me to consider the impact of Plaintiff's actions on close working relationships *for which personal loyalty and confidence are necessary*.  *Rankin*, supra (emphasis added).  Defendants couch this factor as a need for the SAO to maintain a "close working relationship with law enforcement and the confidence of the general public." [DE 7, at 15].  This formulation misstates how the government's interests are to be weighed.  The relationship between the SAO and the police department is not one for which personal loyalty and confidence are necessary.  *McCabe*, 12 F.3d at 1571-73

_____

[9] Defendants discuss in their briefs other postings of internal communications that criticized Plaintiff's superiors.  The SAO's interests as to restraining Plaintiff's right to post such materials are not relevant for the purpose of this balancing test, which only concerns the speech that Plaintiff claims was protected and the reason for the adverse employment action, in this case, the Memo.  Rather, the posting of other internal communication is relevant as to whether the adverse employment action would have been taken even if the Memo had not been posted, which is discussed below.

[10] Florida public record law provides exemptions to public disclosure of certain types of documents.  *See generally* Fla. Stat. § 119.071.  Horn did not invoke any such exemptions in providing the Memo, or otherwise condition the production of the Memo with limitations its dissemination or the excision of confidential information.  Defendants argue that Horn was merely giving Plaintiff the memo Plaintiff himself had written in his capacity as an SAO employee.  However, the undisputed facts as presented, viewed in the light most favorable to Plaintiff, warrant the conclusion that Plaintiff sought possession of the Memo as a public record.  Horn's release of this Memo to Plaintiff as a public record undermines Defendants' position that they should be given deference for wanting to appropriately discipline Plaintiff or control his conduct.

(employer who produced substantial evidence that "loyalty and keeping confidences are required for proper performance of the job" from which the personal secretary was transferred and his concerns about possible disloyalty were not merely subjective fears, but "objectively reasonable" as a matter of common experience); *Stough v. Gallagher*, 967 F.2d 1523, 1529 (11th Cir. 1992) (tilting the balance in favor of employee in the absence of actual evidence that the expression adversely affected the employer's work environment and evidence that personal loyalty was not a prerequisite for the employee's job); *see Pickering*, 391 U.S. at 573 (teacher's employment relationships with school officials did not constitute the kind of close working relationships for which it could be persuasively claimed that personal loyalty and confidence were necessary for their proper functioning). Indeed, where the SAO is charged with investigation of police misconduct, consideration of personal loyalty would be misplaced.

Further, the facts do not indicate that the posting of the Memo has impeded the SAO's ability to perform its duties efficiently in any material sense. Despite the public posting, there is no evidence that any scrutiny and publicity caused by Plaintiff's speech has been so burdensome that the SAO cannot perform its duties efficiently. Or is the SAO impeded from its ability to maintain its policy of not commenting on open investigations.

While the SAO understandably has an interest in restricting what it perceives to be insubordinate behavior, especially behavior that causes embarrassment to the office, such an interest is not dispositive. A "core concern" of the First Amendment is the protection of whistleblowers who report government wrongdoing and Plaintiffs' interests in this speech is high. *Akins v. Fulton County*, Ga., 420 F.3d 1293, 1304 (11th Cir. 2005). Conversely,

an employer's interest in preventing this kind of speech is low. *Id.*; *Cooper*, 89 F.3d at 765 (a sheriff's strong interest in the efficient operation of the police department is insufficient to overcome employee's interest in revealing what he knows about illegal activities within the department); *Fikes*, 79 F.3d at 1084 (employee's attempts to expose police malfeasance helped further the municipality's responsibility to provide effective law enforcement services).  Finally, Horn's release of this Memo to Plaintiff as a public record undermines Defendants' position that they should be given deference for wanting to appropriately discipline Plaintiff or control his conduct in disseminating the Memo.  I conclude that without a more particularized showing of harm to the SAO's ability to administer its duties efficiently, the balance of interests weigh in Plaintiff's favor.

3.     Speech as substantial part in adverse employment action

I next determine whether Defendants suspended Plaintiff in 1997 in substantial part because of Plaintiff's publication of the Memo on a public blog.  The plaintiff's burden in this regard is not a heavy one.  *Stanley*, 219 F.3d at 1291 (relying on *Walker v. Schwalbe*, 112 F.3d 1127, 1131 (11th Cir. 1997); *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1564 (11th Cir. 1995)).  The court is to examine the record as a whole to ascertain whether Plaintiff presented sufficient evidence for a reasonable jury to conclude that his protected speech was a "substantial" motivating factor in the decision to suspend him.  *Id.* I conclude Plaintiff has met this burden.  Plaintiff was suspended effective July 14, 2008, a little over two months after the Memo was posted online, which is sufficiently short to support an inference of retaliation in the First Amendment context.  *Coszalter v. City of Salem*, 320 F.3d 968 (9th Cir. 2003) (time periods of three and eight months between

protected speech and alleged adverse employment actions were not too long to support an inference of retaliation in First Amendment retaliation suit brought by city employees). Further, the reasons for his suspension as set forth in the Notice of Disciplinary Action specifically included the publication of the Memo. Plaintiff has therefore raised a genuine issue of fact to preclude summary judgment on this element.

        4.    Other reasons for adverse employment action

Defendants may nevertheless prevail on their Motion if they can demonstrate by a preponderance of the evidence that the posting of the Memo was not the "but for" cause of the adverse employment action and that legitimate reasons would have motivated the employer to make the same adverse employment decision. *Akins*, 420 F.3d at 1305; *Stanley*, 219 F.3d at 1292-93; *cf. Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005) (A plaintiff's evidence of pretext "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence."); *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc) ("Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it."). As set forth in the Notice of Disciplinary Action, Defendants based the disciplinary action taken against Plaintiff on several additional grounds. According to the Employee Handbook, disciplinary action may be taken against, among others, conduct that causes harm to the integrity, reputation or well-being of the SAO, using abusive language, discussing confidential matters outside the employment of the office, or making false reports. [DE 29-2, at 16].

Besides the posting of the Memo, Defendants cited Plaintiff for disclosing other

internal emails related to the Barquin investigation after he was informed that the Barquin investigation was open and that those materials are confidential.  It is undisputed that per office policy, confidential materials were not to be disclosed unnecessarily and that violation of this policy may be subject to disciplinary action, up to and including dismissal. [DE 29-2, at 14].  Plaintiff responds in his affidavit that these materials were also obtained through a public record request and there were public records that could be shared with the public, and therefore his disclosure of these emails did not constitute legitimate ground for any adverse employment action.[11]  [DE 44-2, ¶ 14].  However, it is undisputed that these additional blog entries, unlike the posting of the Memo, was accompanied by disrespectful comments about Plaintiff's superiors, including complaints about their behavior and honesty.[12]  Plaintiff does not offer evidence, however, to rebut the fact that airing these comments should not be considered insubordinate and offensive behavior meriting disciplinary action.

Defendants also cited an incident in which Plaintiff displayed a lack of candor to his superiors regarding the approval of expenses for the retention of an expert witness.  It is the policy of the SAO that prior to retaining the services of an expert witness, the ASA must

---

[11] For the reasons stated above, I conclude that the SAO's disclosure of materials in response to a public record request, even if from an employee within the agency, is an admission that such materials are public records.  If they are not, they should not have been produced under the appropriate exemption as provided by Florida's public record law

[12] For example, Plaintiff wrote in his blog that his superiors made a "conscious decision" not to inform him of their decision to remove him from the Barquin investigation on the day the decision was made.  In response to an email he received from Horn, he comments that he "[doesn't know what to make of Horn's offer to me to provide input on the case after the case is closed officially."  He further comments in response to a news story quoting Horn that what Horn said "was absolutely untrue." [DE 29-3, Ex. B].

submit a requisition form for approval by a Chief ASA. [DE 29-4, ¶ 2].  Specifically, Howard

Pohl, the Chief ASA responsible for fiscal matters within the SAO, attests that Plaintiff sent

him an email on May 23, 2008 regarding rates of compensation for experts. In response,

Pohl asked Plaintiff to "make sure any expert you retain is aware of the rates and a

requisition for professional services is filled out and approved prior to the expert doing any

work.  Get an estimate from the expert including the review of documents, testing, etc."

Plaintiff then informed Pohl that the expert he wished to retain was Dr. Suarez, that the

estimated need for his services was "20-26 hours" and asked Pohl "[p]lease tell me how

much we're willing to pay, I'll...submit the requisition form once we've all agreed."  Pohl

then answers "you should probably put $5000 on the requisition form...."  [DE 29-4, p.4].

It is undisputed that the Plaintiff had already retained Dr. Suarez and that he had already

performed his services in April 2008 and sent to Plaintiff an invoice for $3,375.  Plaintiff,

through his affidavit, attested that on May 19, 2008, prior to the allegedly deceptive chain

of emails, had already submitted a requisition form to Pohl that indicated the expert's

services had already been performed from April 15 to 24, 2008.  The form, attached as an

exhibit to Mr. Pohl's affidavit, set forth a total "estimate" of costs to be $3,375. [DE 29-4,

p.8].  Although Plaintiff raises questions as to whether Plaintiff intended to deceive Pohl

when the requisition form for approval of the expert expenses had already been submitted,

the email chain eliminates any genuine issue of fact as to whether Defendants have

demonstrated by a preponderance of the evidence that Plaintiff's intended to deceive Mr.

Pohl in order to hide the fact he had improperly retained an expert and incurred fees prior

to receiving approval.  There is simply no evidence in the record that would explain why

Plaintiff's email would imply he "will" retain Dr. Suarez and that a requisition form will be

submitted if he believed Pohl had already received the requisition form.  I conclude that this is a legitimate ground for disciplinary action against Plaintiff.

Finally, Defendants also faulted Plaintiff for a prior instance of inappropriate conduct before a state court judge that took place in August 2005, for which Plaintiff received a Formal Warning/Non-Compliance Reprimand. [DE 29-2, p. 24].  Defendants provide no further evidence as to why this past misconduct, for which Plaintiff had already been disciplined, should form the basis for renewed adverse employment action.  Accordingly, given the passage of time, I conclude that Defendants have failed to carry their burden that this transgression was a legitimate reason for adverse employment action in July 2008.

Reviewing the evidence before me with all inferences in favor of Plaintiff, I am left with the question of whether Defendants have demonstrated by a preponderance of the evidence that disrespectful comments about Plaintiff's superior on a public blog and deceptive conduct concerning expenditures for expert witnesses would have led to the adverse employment action suffered by Plaintiff, namely suspension without pay for thirty days.  Horn's supplemental affidavit sets forth the only evidence on this question.  He attests that he has terminated SAO employees for similar behavior, citing dismissals of an attorney who intentionally misrepresented facts to a superior in order to obtain authorization to give a defendant a low plea and avoid going to trial and an attorney who made misrepresentations to the court. [DE 47-2, ¶ 11].  Horn further attested that Plaintiff's deceptive conduct was similar to the conduct of those attorneys he had dismissed, but in light of Plaintiff's long tenure as an ASA, chose to suspend him instead on the condition he abided by office policies.  Although I find that the nature of the conduct of the attorneys who Horn dismissed was on the whole more egregious that that of Plaintiff's, Plaintiff was

only suspended without pay, not terminated.  Defendants have provided evidence that suspension is two "steps" down from termination in terms of severity of the disciplinary action that can be imposed.  DE 29-2, p. 15] (indicating that demotion is a course of action less severe than termination but more so than suspension without pay).  Based on the fact that Plaintiff was disciplined more leniently, I conclude that Defendants have demonstrated an absence of a genuine issue of material fact as to whether Plaintiff would have been suspended without pay but for the public posting of the memo.  Accordingly, because there were legitimate grounds for the adverse employment action, Plaintiff cannot establish as a matter of law that he has suffered a violation of his First Amendment rights.

>  B.    Clearly established right

>  In evaluating qualified immunity, courts "'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.'" *Wilson v. Layne*, 526 U.S. 603, 609, 119 S. Ct. 1692, 1697, 143 L. Ed. 2d 818 (1999) (quoting *Conn v. Gabbert*, 526 U.S. 286, 290, 119 S. Ct. 1292, 1295, 143 L. Ed. 2d 399 (1999)).  Because I conclude that Plaintiff has not been deprived of a constitutional right, I do not reach the question of whether any such alleged right is clearly established.

## IV.    Conclusion

>  I write in detail in order to recognize that Plaintiff's speech, in the form of the May 2008 blog posting of the Memo, would be an appropriate exercise of Plaintiff's First Amendment rights meriting protection against adverse employment action by his employer.  However, in light of the overall evidentiary record in this case, Plaintiff has not established

he was deprived of his constitutional rights when he was suspended by his employer.

Accordingly, it is hereby

ORDERED and ADJUDGED that:

1.    Defendants' Motion for Summary Judgment [DE 7] is GRANTED.

2.    Defendants' Motion to Strike Plaintiff's Affidavit [DE 33] is DENIED.

3.    All pending motions are DENIED as moot.

4.    This case is CLOSED.

DONE and ORDERED in Chambers in Miami, Florida, this 16th day of June, 2009.


THE HONORABLE ALAN S. GOLD
UNITED STATES DISTRICT JUDGE

cc:
All counsel of record
U.S. Magistrate Judge Chris M. McAliley

28